UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**DIMA SUKARI,**

        Plaintiff,

vs.

Case No.

Hon.

**AKEBONO BRAKE CORPORATION,**

        Defendant.
_____/

Jack W. Schulz (P78078)
Elizabeth A. Gotham (P79058)
SCHULZ GOTHAM PLC
PO Box 44855
Detroit, MI 48244
(313) 652-1906
egotham@schulzgotham.com
jackwschulz@gmail.com
*Attorneys for Plaintiff*
_____/

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

There is no other civil action pending in this Honorable Court or any other Court arising out of the same transaction and occurrence.

**NOW COMES** Plaintiff, **DIMA SUKARI**, for her Complaint against Defendant, Akebono Brake Corporation, stating the following:

## INTRODUCTION

1. Plaintiff Dima Sukari ("Plaintiff") was an exemplary employee for Defendant Akebono Brake Corporation ("Defendant" or "Akebono") from December

2016 until her unexpected termination on February 28, 2018. Throughout her employment with Defendant, Plaintiff suffered from serious health issues related to her back amounting to a disability. However, Plaintiff was able to perform all essential duties of her job as a Compensation Analyst. At times, Plaintiff's condition would severely flareup making it difficult for her to work at the office. Defendant accommodated Plaintiff for several months without issue until a new Vice President of Human Resources was hired over Plaintiff in September 2017. Plaintiff requested the ability to continue to work from home occasionally during flareups but was informed it was against company policy—despite numerous other employees without disabilities working from home freely.

In January 2018, Plaintiff was notified by Defendant that Plaintiff needed to be more "mindful" of her health and appointments in 2018. Following Defendant's assertions, Plaintiff sought and was approved for intermittent FMLA in relation to her condition and related treatments. Defendants immediately intimidated Plaintiff stating that Plaintiff would be unreliable if she frequently used her FMLA and questioning her need for it. A few weeks later, Defendant terminated Plaintiff stating that she was taking too much time off for medical appointments. Plaintiff was escorted out of the building and was forbidden from taking any of her notes relating to the matter at hand.

Within this complaint, Plaintiff alleges that she was terminated in violation of her rights afforded under the FMLA and the Michigan Persons with Disabilities Civil Rights

Act 220 of 1976. Additionally, Plaintiff will seek to amend her Complaint to add claims pursuant to Title VII of the Civil Right Act of 1964, 42 U.S.C. §2000 et. seq. once provided with the right to sue.

## PARTIES

2.  Plaintiff Dima Sukari is an individual who resides in the Eastern District of Michigan.

3.  Defendant Akebono Brake Corporation is a private foreign corporation doing business in Michigan. Akebono Brake Corporation's registered business address is 34385 W Twelve Mile Rd. Farmington Hills, MI 48331.

4.  At all times relevant herein, Defendant acted by and through its agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## JURISDICITON AND VENUE

5.  This Court has original jurisdiction under 28 U.S.C. § 1331 because Plaintiff has raised a Federal Claim under the Family Medical Leave Act of 1993.

6.  Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's state law claims.

7.  This Court is the proper venue pursuant to 28 U.S.C. § 1391(b).

## **GENERAL ALLEGATIONS**

8. Plaintiff Dima Sukari ("Plaintiff") has endured osteoarthritis in her back and other severe back ailments for several years.

9. Plaintiff's medical condition limits her mobility and other major life functions.

10. Plaintiff began her employment as a Compensation Analyst with Defendant Akebono Brake Corporation ("Defendant" or "Akebono") in December 2016.

11. Plaintiff was interviewed by several individuals, including the Manager of Compensation, Benefits, and HRIS, Frank Williams ("MOC Williams") and the Vice President of Human Resources John Baylis ("VP Baylis")

12. Plaintiff was able to perform all essential functions of her position as a Compensation Analyst with or without an accommodation.

13. Plaintiff provided notice to her supervisor, MOC Williams, that she suffered from serious back pain and it was difficult for her to work from the office during flare ups.

14. Defendant, specifically MOC Williams allowed Plaintiff to work from home during serious flare ups of her osteoarthritis.

15. In or around February 2017, VP Baylis retired from Defendant and was replaced by a new Vice President of Human Resources, Carna Cureton ("VP Cureton").

16. As with VP Baylis, VP Cureton allowed Plaintiff to work from home when her osteoarthritis flared up.

17. In or around April 2017, Plaintiff had medical issues related to her gallbladder and a hernia requiring surgery. Plaintiff went on short-term disability for a period of 2-3 weeks.

18. Plaintiff received a performance evaluation in May 2017. Plaintiff received positive reviews and a performance based raise.

19. In or around June 2017, MOC Williams separated his employment from Defendant. From this point until around September 2017, Plaintiff reported directly to VP Cureton.

20. In or around July 2017, Plaintiff's doctor recommended a special desk which allowed for standing. Plaintiff provided this written recommendation to VP Carna. VP Carna Approved the request and said she would forward the approval to HR Manager Amy Saldivar ("HR Saldivar").

21. Although the request for the standing desk was submitted in July, it ultimately took several months to be delivered. After the first month or so passed without the desk, Plaintiff approached an employee in the facilities department who stated he was still waiting on approval from HR Saldivar to place the order.

22. In or around September 2017, VP Cureton separated from Defendant and was replaced by a new Vice President of Human Resources, Eric Torigian ("VP Torigian")

23. Plaintiff's standing desk arrived after the arrival of VP Torigian.

24. During this period, a new Supervisor of Compensation Benefits, Erin Snygg ("SC Snygg"), was hired as a supervisor over Plaintiff. It was Plaintiff's impression that she was being considered for the opening.

25. Plaintiff has stronger credentials and experience than SC Snygg for the position of Supervisor of Compensation Benefits.

26. Unlike MOC Williams and VP Carna, VP Torigian would not allow Plaintiff to work from home during flareups of her osteoarthritis. VP Torigian stated it would be against company policy according to instructions from HR Saldivar.

27. Notably, numerous other employees were permitted to work from home during this period, including but not limited to, VP Torigian, HR Saldivar, Sheila Hoover, and SC Snygg.

28. Additionally, Plaintiff was required to make up time when she took partial time off for medical appointments and flareups. On information and belief, other employees were not required to do the same.

29. Defendant's office was closed from December 24, 2017 until after new years on January 1, 2018.

30. Following this brief closure, Plaintiff was pulled into HR Saldivar's office, along with SC Snygg, who informed Plaintiff that she needed to be very mindful of taking medical appointments moving forward in 2018. Further, they instructed Plaintiff that she would be required to submit a time sheet similar to hourly employees and try her best to schedule doctor appointments outside of core hours.

31. About a week after this meeting, Plaintiff emailed SC Snygg and requested FMLA paperwork in relation to her back condition. SC Snygg responded that she would forward the request to HR Saldivar.

32. About a week later, after no paperwork was provided, Plaintiff entered HR Saldivar's office to follow up regarding her request for FMLA paperwork.

33. A few days later, HR Saldivar brought the FMLA paperwork to Plaintiff and informed her that it needed to be submitted by January 31, 2018.

34. Shortly after, Plaintiff consulted her doctor who timely faxed the completed FMLA paperwork directly to HR Saldivar.

35. Shortly after, HR Saldivar dropped an envelope on Plaintiff's desk containing her FMLA approval and stated that she intended to meet with Plaintiff to go over the paperwork.

36. On or around January 31, 2018, Plaintiff met with HR Saldivar in Saldivar's office. Initially, HR Saldivar informed Plaintiff that she was approved for intermittent FMLA and briefly explained Plaintiff's rights. Next, HR Saldivar stated

that she needed to limit the amount of time she took FMLA because Plaintiff works in a department where employees "needed to be reliable." HR Saldivar also questioned Plaintiff on why she decided to request FMLA now. Plaintiff responded that her back was feeling worse and her doctor was recommending physical therapy. Further, that if the therapy didn't work Plaintiff may need injections for pain management. VP Saldivar expressed frustration with Plaintiff's response and abruptly exclaimed that Plaintiff "can't wait until the day of to notify [Defendants] of flare ups" and that she needed to provide ample notice. Plaintiff stated she would try but warned that she is unable to predict the flareups.

37. Following this meeting, Plaintiff rarely utilized FMLA and always followed the proper channels. On information and belief, Plaintiff may have only utilized it once during the second week of February.

38. On February 28, 2018, Plaintiff was approached by VP Torigian and HR Saldivar. VP Torigian stated that the company needed to let Plaintiff go because the time she was taking off for medical appointments was unacceptable. VP Torigian handed Plaintiff a severance agreement and left the office leaving Plaintiff and HR Saldivar alone.

39. Plaintiff immediately began to cry and questioned HR Saldivar what had happened because her absences were approved under FMLA. HR Saldivar stated the Plaintiff would have to take it up with VP Torigian—but that he had to go to a meeting.

40. HR Saldivar escorted Plaintiff to her desk to get some personal items. Plaintiff attempted to bring a notebook containing her notes but HR Saldivar ripped it from her hands stating it was now company property. Plaintiff was not otherwise allowed to touch anything and was escorted out of the building

## COUNT I
## VIOLATION OF THE FAMILITY MEDICAL LEAVE ACT - INTERFERENCE

41. All preceding paragraphs are incorporated by reference.

42. Plaintiff was an eligible employee under the definitional terms of the Family and Medical Leave Act, 29 U.S.C. § 2611(2)(a)(i)(ii).

43. Defendant has more than 50 employees and is an employer subject to the FMLA.

44. At the time of her FMLA paperwork, Plaintiff she had worked over 1250 hours within the 12-month period preceding her leave request.

45. Plaintiff was approved by Defendant for intermittent FMLA in relation to her serious back issues and related treatment.

46. Defendant has interfered with and denied plaintiff her FMLA rights as described above and herein, including, but not limited to, failing to provide Plaintiff with leave under for treatment of her serious health condition and instead discharging Plaintiff from her position, in violation of 29 USC 2615 (a) and 29 CFR 825.220.

47. Defendant's actions were intentional, with deliberate disregard for the rights and sensibilities of the Plaintiff.

48. Defendant's interference with Plaintiff's FMLA leave has directly and proximately caused Plaintiff great damages, including embarrassment, humiliation, outrage, mental distress and economic loss of large but as of yet undetermined proportions.

## COUNT II
## VIOLATION OF THE FAMILITY MEDICAL LEAVE ACT - RETALIATION

49. All preceding paragraphs are incorporated by reference.

50. Defendant retaliated against Plaintiff in violation of the FMLA leave by terminating her in response to requesting and utilizing protected leave in violation of 29 USC 2615 (a) and 29 CFR 825.220.

51. Defendant's actions were intentional, with deliberate disregard for the rights and sensibilities of the Plaintiff.

52. There is a causal connection between Plaintiff's protected activity and Defendant's retaliatory actions described above.

53. As a direct and proximate result of Defendant's unlawful actions, Plaintiff has sustained injuries and damages including, but not limited to, loss of pay, loss of career opportunities, humiliation and embarrassment, mental anguish and emotional distress, loss of professional reputation, and loss of the ordinary pleasures of everyday

life, including the right to pursue gainful occupation of choice and incurred substantial liability for attorney fees.

## COUNT III
## DISABILITY DISCRIMINATION – MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT 220 OF 1976, MCL 37.1602

54. All preceding paragraphs are incorporated by reference.

55. Plaintiff has a serious and disabling medical condition, a covered disability under the act, was perceived as having a disability and/or had a record of having a disability.

56. Plaintiff's disability affected her ability to engage in one or more major life activities.

57. Plaintiff was/is qualified for her former position as a Compensation Analyst.

58. Plaintiff's disability did not affect her ability to perform the essential functions of his position as a Compensation Analyst.

59. Defendants discriminated against Plaintiff by terminating her because of her disability and in retaliation for seeking an accommodation.

60. As a further direct and proximate result of Defendants' wrongful acts, Plaintiff has sustained injuries and damages including but not limited to: loss of earnings and earning capacity; loss of career opportunities; loss of fringe and pension benefits; mental anguish; physical and emotional distress; humiliation and embarrassment; loss

of professional reputation; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful employment of her choice.

## COUNT IV
### DISABILITY DISCRIMINATION – MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT 220 OF 1976, MCL 37.1602

61. All preceding paragraphs are incorporated by reference.

62. Plaintiff was qualified for the position of Supervisor of Compensation with Defendant.

63. Plaintiff was denied a promotion to the position of Supervisor of Compensation and was passed over for a less experienced and skilled individual without a disability.

64. Plaintiff's disability factored into Defendant's decision not to promote Plaintiff to the position of Supervisor of Compensation.

## COUNT V
### FAILURE TO ACCOMMODATE – MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT 220 OF 1976, MCL 37.1602

65. All preceding paragraphs are incorporated by reference.

66. Plaintiff requested to continue working from home as an accommodation during flare ups of her serious and disabling medical condition, covered disability under the act, or perceived disability.

67. Plaintiff was previously provided this accommodation by Defendant without issue and received excellent performance reviews.

68. Other employees comparable to Plaintiff without disabilities were allowed to work from home without issue.

69. Defendant unlawfully denied Plaintiff a demonstrably reasonable accommodation.

70. As a direct and proximate result of Defendants' wrongful acts, Plaintiff has sustained injuries and damages including but not limited to: loss of earnings and earning capacity; loss of career opportunities; loss of fringe and pension benefits; significant medical bills; mental anguish; physical and emotional distress; humiliation and embarrassment; loss of professional reputation; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful employment of his choice.

71. Plaintiff is in the process of submitting a charge of disability discrimination with the Equal Employment Opportunity Commission. Plaintiff will seek to amend her Complaint to add claims pursuant to Title VII of the Civil Right Act of 1964, 42 U.S.C. §2000 *et. seq.* once provided with the right to sue.

### **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Honorable Court:

a. Grant her all available compensatory damages for economic injury, including back and front pay, extreme mental and emotional distress, humiliation, outrage, economic damages, loss of employment opportunity, harm to reputation, loss

of earning capacity, punitive damages, liquidated damages, and any other damages available by law;

    b.    Grant Plaintiff's reasonable attorney's fees and costs incurred in this litigation; and

    c.    Grant all such further relief as shall meet equity and good conscience.

Respectfully submitted,

By: /s/ Jack W. Schulz
Jack W. Schulz (P78078)
Elizabeth A. Gotham (P79058)
SCHULZ GOTHAM PLC
PO Box 44855
Detroit, MI 48244
(313) 652-1906
egotham@schulzgotham.com
jackwschulz@gmail.com
*Attorneys for Plaintiff*

DATE: March 27, 2018

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**DIMA SUKARI,**

        Plaintiff,

vs.

Case No.

Hon.

**AKEBONO BRAKE CORPORATION,**

        Defendant.
_____/

Jack W. Schulz (P78078)
Elizabeth A. Gotham (P79058)
SCHULZ GOTHAM PLC
PO Box 44855
Detroit, MI 48244
(313) 652-1906
egotham@schulzgotham.com
jackwschulz@gmail.com
*Attorneys for Plaintiff*
_____/

## DEMAND FOR TRIAL BY JURY

Plaintiff Dima Sukari hereby demands for a trial by jury.

        Respectfully submitted,

        By: /s/ Jack W. Schulz
        Jack W. Schulz (P78078)
        Elizabeth A. Gotham (P79058)
        SCHULZ GOTHAM PLC
        PO Box 44855
        Detroit, MI 48244
        (313) 652-1906
        *Attorneys for Plaintiff*

DATE: March 27, 2018